**2014-5001**

In The

# United States Court of Appeals

### For The Federal Circuit

## MARCUM LLP,

*Plaintiff – Appellant*,

**v.**

## UNITED STATES,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 13-CV-0189, JUDGE MARIAN BLANK HORN.**

––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––

**Andrew S. Ittleman**
**Mitchell S. Fuerst**
**Joseph A. DiRuzzo, III**
**FUERST ITTLEMAN DAVID & JOSEPH, PL**
**1001 Brickell Bay Drive, 32nd Floor**
**Miami, Florida 33131**
**(305) 350-5690 (Telephone)**
**(305) 371-8989 (Facsimile)**
**AIttleman@fuerstlaw.com**

*Counsel for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant, Marcum LLP, certifies the following:

1.      The full name of every party or amicus represented by me is Marcum

LLP.

2.      The party named in the caption is the real party in interest.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are: The Marcum

Group LLC.

4.      The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the Claims Court or are

expected to appear in this court are:

       a.      Fuerst Ittleman David & Joseph, PL
       b.      Andrew Ittleman, Esq.
       c.      Mitchell Fuerst, Esq.
       d.      Joseph A. DiRuzzo, III, Esq.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTEREST .................................................................................i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT OF RELATED CASES ................................................................ vii

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUE ..............................................................................1

STATEMENT OF THE CASE ................................................................................2

STATEMENT OF FACTS .......................................................................................3

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT ........................................................................................................15

    I.     Standard of Review .................................................................................15

    II.    The Claims Court Erred in Ruling that the Tucker Act is Preempted by the Criminal Justice Act's "Compensation Framework" ...........................................................................................16

          A.    The Claims Court Erred in Holding That a *Per Se* Rule Exists Preventing the Claims Court From Reviewing Any Acts of Other Courts ................................................................16

          B.    The Claims Court Erred in Holding that the CJA Displaced the Tucker Act ..........................................................21

CONCLUSION AND PRAYER FOR RELIEF ...................................................... 25

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allustiarte v. United States,*
    256 F.3d 1349 (Fed. Cir. 2001) .................................................................17, 18

*Boise Cascade Corp. v. United States,*
    296 F.3d 1339 (Fed. Cir. 2002) .................................................................15

*Del Rio Drilling Programs, Inc. v. United States,*
    146 F.3d 1358 (Fed. Cir. 1998) .................................................................23

*Ed A. Wilson, Inc. v. Gen. Servs. Admin.,*
    126 F.3d, 1408 (Fed. Cir. 1997) .................................................................15

*Forrester v. White,*
    108 S. Ct. 538 (1988).................................................................19, 20

*Horne v. USDA,*
    186 L. Ed. 2d 69 (2013).................................................................21

*In re Baker,*
    693 F.2d 925 (9th Cir. 1982) .................................................................5, 6

*In re Gross,*
    704 F.2d 670 (2d Cir. 1983) .................................................................22

*Innovair Aviation Ltd. v. United States,*
    632 F.3d 1336 (Fed. Cir. 2011) .................................................................17, 18

*Joshua v. United States,*
    17 F.3d 378 (Fed. Cir. 1994) .................................................................17, 18

*Kent v. Dulles,*
    357 U.S. 116 (1958).................................................................24

*Kerr v. United States Dist. Court for Northern Dist.*,
426 U.S. 394 (1976)...................................................................23

*Public Citizen v. DOJ*,
491 U.S. 440 (1989)...................................................................24

*Shearin v. United States*,
992 F.2d 1195 (Fed. Cir. 1993) .........................................5, 16, 21

*Tippett v. United States*,
185 F.3d 1250 (Fed. Cir. 1999) ...................................................15

*United States v. Bloomer*,
150 F.3d 146 (2d Cir. 1998) .....................................................5, 6

*United States v. Bormes*,
133 S. Ct. 12 (2012)...................................................................21

*United States v. Fausto*,
484 U.S. 439 (1988)...................................................................21

*United States v. Stone*,
53 F.3d 141 (6th Cir. 1995) .......................................................21

*Vereda v. United States*,
271 F.3d 1367 (Fed. Cir. 2001) ............................................17, 18

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V .................................................................*passim*

U.S. Const. amend. VI.................................................................4

## STATUTES

18 U.S.C. § 3006A ...................................................................2, 4

18 U.S.C. § 3006A(a)...................................................................5

18 U.S.C. § 3006A(e)(1) ...................................................................6

18 U.S.C. § 3006A(e)(3) ...............................................................7, 21

18 U.S.C. § 3006A(h) ...................................................................5

28 U.S.C. § 1291 .........................................................................5

28 U.S.C. § 1295(a)(3) ...................................................................1

28 U.S.C. § 1491 ...................................................................1, 3, 14

## **RULE**

Fed. R. App. P. 2 .......................................................................18

## <u>STATEMENT OF RELATED CASES</u>

1.    There are no other appeals in or from the same civil action or proceeding before the United States Court of Federal Claims before this or any other court.

2.    There are no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

On March 13, 2013, Marcum filed its Complaint before the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491 (the Tucker Act). On August 2, 2013, the Claims Court granted the Motion to Dismiss filed by the United States on the grounds that the Claims Court lacked the subject matter jurisdiction necessary to hear the case. The Claims Court's order dismissing Marcum's lawsuit was final and disposed of all of Marcum's claims. This court has appellate jurisdiction under 28 U.S.C. § 1295(a)(3) which provides that "[t]he United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction…of an appeal from a final decision of the United States Court of Federal Claims."

## STATEMENT OF THE ISSUE

Whether the United States Court of Federal Claims has subject matter jurisdiction to hear a Fifth Amendment takings claim stemming from an administrative decision issued by a Chief Judge of a United States Court of Appeals pursuant to the Criminal Justice Act.

## STATEMENT OF THE CASE

The Appellant, Marcum LLP (hereinafter, "Marcum"), is a professional services firm with offices in New York, Connecticut, Pennsylvania, Florida, Massachusetts, California, Grand Cayman, and China. Marcum offers its clients a wide variety of professional services. Relevant to this case, Marcum offers forensic accounting and litigation support services in a wide variety of proceedings, including civil and criminal trials.

In 2011, Marcum was retained pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A to provide services to defense counsel in the United States government's high profile prosecution of Allan R. Stanford, who was accused of operating a multi-billion dollar Ponzi scheme disguised as a legitimate financial services firm. Mr. Stanford's criminal case was styled as Case # 4:09-cr-00342 in the United States District Court for the Southern District of Texas, District Judge David Hittner presiding.

As of December 2011, despite issuing monthly vouchers to the District Court as required by the CJA, Marcum had not been paid for any work it had performed in September, October, November, or December, and was owed approximately $700,000. On December 30, 2011, Marcum advised defense counsel that it was resigning from the case, and defense counsel advised the District Court of Marcum's resignation later that day.

As we explain in greater detail below, Chief Judge Edith Jones of the United States Court of Appeals for the Fifth Circuit issued an order (the "Service Provider Continuity and Payment Order") on January 4, 2012 requiring Marcum to return to work under threat of contempt sanctions. Upon receiving Judge Jones's order, Marcum returned to work, but also sought relief from the order from Judge Jones, the Fifth Circuit, and the United States Supreme Court, all of which was denied. Marcum worked under threat of contempt sanctions through the Stanford trial, and was ultimately left with $1,204,422.18 in unpaid fees.

On March 13, 2013, Marcum filed its Complaint before the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491 (the Tucker Act). On May 15, 2013, the United States filed its Motion to Dismiss Marcum's claim on the grounds that the Claims Court lacked subject matter jurisdiction. Marcum filed its First Amended Complaint on May 30, 2013, and the United States refiled its Motion to Dismiss on June 17, 2013. On August 2, 2013, the Claims Court granted the government's Motion to Dismiss, ruling that it lacked the subject matter jurisdiction necessary to hear Marcum's case. Marcum filed its Notice of Appeal on September 23, 2013.

## STATEMENT OF FACTS

The factual and procedural history of this case runs parallel with the United States Government's criminal prosecution of Allan R. Stanford. Mr. Stanford's

3

indictment was made public on June 19, 2009; A19. That same day, the Securities and Exchange Commission (SEC) instituted fraud proceedings against Mr. Stanford and his company, Stanford Financial Group; A19. Later that day, the United States Government seized 33 offices of the Stanford Financial Group and arrested Mr. Stanford. Mr. Stanford would remain in custody throughout his civil and criminal proceedings; A19.

In addition to the Government's civil and criminal proceedings, the Government initiated a massive seizure of Mr. Stanford's assets. As the result of the seizure, Mr. Stanford was left financially incapable of retaining counsel to represent him. On October 27, 2010, the District Court issued an order declaring Mr. Stanford indigent and unable to afford defense counsel; A19.

In criminal cases like Mr. Stanford's where the defendant is financially incapable of retaining counsel, federal law provides funding for attorneys, experts, and services to ensure that the indigent defendant's proceedings comply with the Sixth Amendment; *see* 18 U.S.C. § 3006A, also known as The Criminal Justice Act, or CJA. The CJA is administered by the Administrative Office of the United States Courts, based on guidelines promulgated by the Judicial Conference of the United States. Orders issued by District Court and Chief Circuit Judges are administrative rather than judicial in nature. Pursuant to § 3006A, Ali R. Fazel,

Esq. and Robert Scardino, Esq. were appointed by the District Court to serve as Mr. Stanford's trial counsel; A20.

Like all other statutes, the CJA must be administered. Thus, the CJA requires "[e]ach United States district court, with the approval of the judicial council of the circuit, [to] place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section." 18 U.S.C. § 3006A(a). Additionally, the CJA requires "[e]ach district court and court of appeals of a circuit [to] submit a report on the appointment of counsel within its jurisdiction to the Administrative Office of the United States Courts in such form and at such times as the Judicial Conference of the United States may specify. The Judicial Conference of the United States may, from time to time, issue rules and regulations governing the operation of plans formulated under this section." 18 U.S.C. § 3006A(h).

It is well settled that orders entered by District Court and Court of Appeals judges under the CJA are administrative rather than judicial in nature; *see Shearin v. United States*, 992 F.2d 1195, 1196 (Fed. Cir. 1993); *United States v. Bloomer*, 150 F.3d 146, 148 (2d Cir. 1998); *In re Baker*, 693 F.2d 925, 926-27 (9th Cir. 1982). Moreover, although orders entered pursuant to the CJA are final, they are not judicial "decisions" within the meaning of 28 U.S.C. § 1291 and are therefore

not appealable; *Baker*, 693 F.2d at 926. Consequently, the authority of the Courts of Appeal is limited to approving payments in excess of the maximums included in the CJA; *Bloomer*, 150 F.3d at 149.

Due to the vast and highly complex nature of Mr. Stanford's criminal case, Mr. Stanford's defense attorneys sought third party consultants to assist in their defense of Mr. Stanford. Among other critical tasks, defense counsel required assistance with forensic accounting, trial preparation, and expert witness services. Defense counsel hired Marcum in June of 2011 to replace a previously retained firm; A20.

Like the appointment of the defense attorneys themselves, Marcum's retention was governed by the CJA:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1); A20.

Payment for Marcum's services was also governed by the CJA:

> Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an

> employee thereof, shall not exceed $2,400, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

18 U.S.C. § 3006A(e)(3); A20-A21.

In participating in Mr. Stanford's defense, Marcum's budget far exceeded the $2,400 threshold contained in the statute. Accordingly, before performing any work on the case, Marcum submitted its budget (via defense counsel) to Judge Hittner, and estimated the total cost for its services as approximately $4.5 million. Judge Hittner approved the Marcum budget and authorized Marcum to begin working; A21.

The Stanford defense was a hugely complicated undertaking; merely gathering the available documents proved to be a monumental effort. The government's seizure of the 33 Stanford offices yielded approximately 15,000 banker's boxes of documents, as well as 5,000 electronic storage devices and data servers; A21. All of this was made available to the Stanford defense team, which naturally needed to mine it in order to develop Mr. Stanford's defense. The government also produced to the Stanford defense team a database of 4 terabytes

of data, including documents, voicemails, emails and other items obtained by the government during its investigation; A21. There were also documents related to Mr. Stanford's foreign banks and related holdings located all over the world. Working under the direction of defense counsel, it was among Marcum's duties to gather and organize this information; A21.

Marcum was also retained to offer expert witness services to the Stanford defense; A21. In order to serve as competent expert witness, Marcum employees were required to familiarize themselves with the huge volumes of data seized from the Stanford offices and opine on the sophisticated accounting and related issues which the government alleged to be at the heart of Mr. Stanford's criminal conspiracy; A21.

Adding to the difficulty of Marcum's engagement was the physical and mental state of Mr. Stanford himself. In criminal cases, defendants are presumed to qualify for pre-trial release. Pre-trial release allows defendants to work with their lawyers and experts to develop their defense, and many defense attorneys believe that – especially in white collar prosecutions – the client can be an indispensable part of the defense team. When defendants are not granted pre-trial release, the defense loses the primary value of this asset, and defendants must do what they can to assist their lawyers and experts from within detention facilities. Due to a horrible series of events which befell Mr. Stanford while in federal custody, Mr.

Stanford was rendered incompetent to stand trial and was totally unavailable to his defense team throughout their preparation of his defense; A21-A22. In fact, Mr. Stanford was only declared competent on December 22, 2011, only one month prior to the start of his trial; A22.

In June, July and August of 2011, consistent with the CJA and the CJA Plan for the Southern District of Texas, Marcum submitted monthly vouchers for work performed with the expectation that its vouchers would be paid. A22. In September of 2011, Marcum learned that Judge Hittner had certified the Marcum vouchers and had submitted them to the Fifth Circuit for approval and payment. Marcum's June, July and August vouchers were paid in October of 2011; A22.

In September of 2011, at the request of defense counsel and the district court, Marcum submitted a new interim budget, estimating the total cost for services at approximately $3.2 million; A22. This new, reduced figure was based on estimated expenses of $428,550 per month for the months of September, October, November and December of 2011; A22.

In September, October and November of 2011, Marcum submitted further vouchers to Judge Hittner totaling $845,588.48, which was approximately $440,000 less than Marcum had estimated in its September 2011 proposed budget; A22. Judge Hittner certified Marcum's September and October vouchers and submitted them to the Fifth Circuit, but did not act on the November voucher; A22.

Before approving Marcum's September and October 2011 vouchers, Judge Hittner, at the request of the Fifth Circuit, appointed Marlo P. Cadeddu, Esq. to act as a discovery expert and review Marcum's budgets and expenses; A22-A23. Ms. Cadeddu's examination of the work completed by Marcum occurred over the months of November and December, 2011. Throughout that time, despite not having been paid since September, Marcum both continued to work on the Stanford case and made itself available "around the clock" to respond to Ms. Cadeddu's questions and document requests; A23.

On December 20, 2011, Ms. Cadeddu issued a memorandum to the Chief Judge of the Fifth Circuit detailing the results of her review, in which she explained the complexity of the case, the accomplishments of Marcum, and the reasons why Marcum was so critical to Mr. Stanford's defense. A23. Ms. Cadeddu opined as follows: "because the allegations in the indictment center on accounting and financial irregularities, Mr. Stanford's case is necessarily expert-dependent. Accordingly, de-funding all defense experts at this point would leave Mr. Stanford without any defense at all." A23.

In spite of the highly favorable report issued by Ms. Cadeddu to the Fifth Circuit, as of December 30, 2011, Marcum was still working, had not been paid for any of the work it performed in September, October, November and December of 2011, and was owed approximately $700,000. Worse, the trial of Mr. Stanford was

rapidly approaching and Marcum had no idea when – if ever – it would be paid for its work; A23.

Accordingly, via letter dated December 30, 2011, Marcum advised defense counsel that, pursuant to the terms of its engagement letter, it was resigning; A23. Later that day, defense counsel filed Marcum's letter with the District Court under seal as an attachment to an agreed motion for the district court to continue Mr. Stanford's January 23, 2012 trial date; A23. The District Court was thus advised of Marcum's resignation.

On January 4, 2012, Chief Judge Edith Jones of the United States Court of Appeals for the Fifth Circuit entered the Service Provider Continuity and Payment Order; A77. In that Order, Judge Jones wrote as follows:

> Marcum LLP has submitted vouchers for work done in September, October and November 2011, totaling $845,588.48. The District Court has certified the September and October vouchers, which total $571,483.48. I hereby approve payment of $205,000 on these vouchers, subject to district court certification of the November voucher.

A24, A77. Marcum's September, October and November vouchers were thus reduced by approximately $640,000; A24.

Regarding Marcum's "purport[ed]" resignation, Judge Jones wrote as follows:

> It would be neither feasible nor economical to obtain a replacement to perform the services Marcum was

> expected by counsel to provide. Marcum LLP, and its partners, employees and agents are therefore ORDERED to continue work on the case as previously planned, including the provision of testifying experts, through the end of trial, and, if required by counsel, through the conclusion of the case in the district court.

A24, A77.

Upon receiving Judge Jones's order, Marcum immediately set about the process of considering its options and retained counsel of its own (Mark Bayer, Esq. of Gardere Wynne Sewell LLP in Dallas, Texas) to assist in that process. Mr. Stanford's trial was less than three weeks away; A24.

On Friday January 6, 2012, Marcum was advised by Chief Judge Jones's clerk that Judge Jones had noticed Marcum "for a contempt hearing at 4:00 PM on Monday January 9 at the federal courthouse in Houston." A24. Under threat of contempt sanctions, Marcum diligently set about the process of preparing for the Stanford trial which was still scheduled to start on January 23, 2012; A24.

Meanwhile, counsel for Marcum sought to challenge Chief Judge Jones's order by filing the following documents, all of which were denied:

> a. Ex Parte Emergency Motion for Reconsideration before Chief Judge Jones;
>
> b. Emergency Application for Stay before the United States Supreme Court, Case No. 11-686;
>
> c. Emergency Motion for Stay, or in the alternative, Petition for Writ of Mandamus before the United States

12

Court of Appeals for the Fifth Circuit, Case No. 12-20054;

d.    Petition for Writ of Mandamus before the United States Supreme Court, Case No. 11-896.

A24-A25.

Facing the Hobson's choice of resigning and being held in contempt of court on the one hand, and continuing to work and incurring devastating financial losses on the other, Marcum chose the latter and assisted defense counsel throughout Mr. Stanford's jury trial. After his trial, Mr. Stanford was sentenced to 1,320 months in prison and a money judgment of $5.9 billion; A25.

In addition to the vouchers described above, Marcum submitted vouchers for the work it performed leading up to the January 4, 2012 Service Provider Continuity and Payment Order and through the Stanford criminal trial. Marcum submitted these vouchers on January 4, 2012 (for work performed between December 1, 2011 and December 31, 2011), January 27, 2012 (for work performed between January 1, 2012 and January 22, 2012), and March 19, 2012 (for work performed between January 23, 2012 and March 8, 2012).[1] A25. In sum, Marcum was left with $1,204,422.18 in unpaid fees; A25.

---

[1]  Marcum also submitted a voucher dated June 22, 2012. However, this voucher was for a Final Payment and indicated that no work was performed between March 9, 2012 and June 22, 2012.

The direct, foreseeable and proximate result of Chief Judge Jones's January 4, 2012 Service Provider Continuity and Payment Order, together with threats of sanctions, was to obliterate the contract between Marcum and defense counsel and force Marcum into involuntary servitude for public use, namely the provision of a constitutionally adequate defense to an indigent defendant in a multi-billion dollar fraud prosecution on the one hand, and the "speedy trial" for the benefit of fraud victims awaiting restitution on the other; A25.

On March 13, 2013, Marcum filed its Complaint before the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491 (the Tucker Act), and on August 2, 2013, the Claims Court (Horn, J.) ruled that it lacked the subject matter jurisdiction necessary to hear Marcum's case; A1 – A15. The Claims Court's decision concluded as follows:

> Because plaintiff's claim filed with this court challenges the Continuity and Payment Order, issued by the Chief Judge of the Court of Appeals for the Fifth Circuit and the determinations of plaintiff's compensation pursuant to the CJA, this court lacks jurisdiction to review plaintiff's claim. Plaintiff may not circumvent the compensation framework Congress enacted in the CJA by attempting to frame its complaint as an alleged Fifth Amendment takings claim in the Court of Federal Claims.

A14.

For reasons set forth below, we respectfully disagree with the decision of the Claims Court, and respectfully move this Court to reverse it.

14

## SUMMARY OF THE ARGUMENT

The Claims Court has the subject matter jurisdiction necessary to hear Marcum's takings claim. First, because Chief Judge Jones's order was administrative in nature and not appealable, it may be "scrutinized" as a taking by the Claims Court. Additionally, because the CJA does not contain a "comprehensive review scheme," it does not displace the Claims Court's Tucker Act jurisdiction.

## ARGUMENT

### I.     Standard of Review

The United States Court of Federal Claims denied hearing Marcum's Fifth Amendment takings claim on the grounds that it lacked the requisite subject matter jurisdiction. A decision by the Claims Court to dismiss a complaint for lack of subject matter jurisdiction is a question of law subject to a *de novo* standard of review. *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002). In its *de novo* review, this Court may conduct a complete and independent review of the issue of law before it without deference to the Claims Court. *Id.* This Court has held that it considers jurisdictional questions to be issues of statutory interpretation over which it exercises plenary review. *Ed A. Wilson*, *Inc. v. Gen. Servs. Admin.*, 126 F.3d 1406, 1408 (Fed. Cir. 1997); *see also Tippett v. United States*, 185 F.3d 1250, 1254 (Fed. Cir. 1999).

## II.   The Claims Court Erred in Ruling that the Tucker Act is Preempted by the Criminal Justice Act's "Compensation Framework"

As previously discussed, this case stems from the Service Provider Continuity and Payment Order issued by Chief Judge Jones on January 4, 2012, which required Marcum to continue working on the Stanford case under threat of contempt sanctions with no promise of future payment. It is beyond dispute that the Order was administrative in nature, and not appealable, and the Claims Court stated so in its decision; A12; *citing Shearin v. United States*, 992 F.2d 1195, 1196 (Fed. Cir. 1993). However, according to the Claims Court, the *only* recourse available to Marcum was "the compensation framework Congress enacted in the CJA," as well as a motion for reconsideration filed with Chief Judge Jones and a petition for writ of mandamus filed with the United States Supreme Court. This was erroneous.

### A.   The Claims Court Erred in Holding That a *Per Se* Rule Exists Preventing the Claims Court From Reviewing Any Acts of Other Courts.

As a threshold matter, the Claims Court ruled that it lacked the subject matter jurisdiction necessary to review the decision of another court, regardless of the context in which the decision was made and regardless of the capacity in which the other court made its decision; A11. More specifically, the Claims Court ruled that it lacked the jurisdiction "to scrutinize the propriety of District Court Judge

16

Hittner's and Chief Judge Jones' determinations regarding plaintiff's compensation under the CJA." A11. The Claims Court's decision was based on an overly simplistic reading of this Court's jurisprudence and should be reversed.

To be sure, the Claims Court based its decision on *Innovair Aviation Ltd. v. United States*, 632 F.3d 1336, 1343 (Fed. Cir. 2011), *Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed. Cir. 2001) and *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994); A11. However, each of the cases relied upon by the Claims Court is demonstrably inapplicable to this case, and none stands for the proposition that *administrative* decisions of courts cannot be reviewed as takings claims by the Court of Claims.

First, in *Innovair*, the plaintiff ("Innovair") filed a Fifth Amendment takings claim in the Claims Court after the United States had seized pursuant to the Controlled Substances Act ("CSA") a technology license agreement ("TLA") to which Innovair was a party without providing just compensation. In that case, relying on *Vereda v. United States*, 271 F.3d 1367 (Fed. Cir. 2001), this Court ruled that the Claims Court lacked the jurisdiction necessary to hear Innovair's claim because the Tucker Act was preempted by the CSA's "comprehensive administrative and judicial system to review the *in rem* administrative forfeiture of property…" *Innovair*, 632 F.3d at 1242-1343; *quoting Vereda*, 271 F.3d at 1370.

In *Allustiarte*, plaintiffs ("Allustiarte") filed a Fifth Amendment takings claim in the Claims Court following a variety of allegedly improper actions which occurred in the Bankruptcy Courts in the Ninth Circuit. *Allustiarte*, 256 F.3d at 1350. However, as in *Vereda* and *Innovair*, this Court looked to the review scheme incorporated in the bankruptcy laws which included merits-based appeals to the District Court and Ninth Circuit, as well as a petition for *certiorari* in the United States Supreme Court; *Id.*, at 1352.

Similarly, in *Joshua*, the plaintiff ("Joshua"), a prison inmate, filed suit in the Claims Court against the United States District Court for the Western District of Lousiana, as well as a judge and a clerk in that Court. *Joshua*, 17 F.3d at 379. Joshua's suit, which sought $36 billion in damages, alleged violations of a variety of criminal statutes resulting from the District Court's dismissal of a lawsuit he had previously filed there. *Id.* In disposing of Joshua's appeal pursuant to Rule 2 of the Federal Rules of Appellate Procedure, this Court affirmed the Claims Court's dismissal of Joshua's suit, and noted that the Claims Court lacked the "jurisdiction to review the decisions of district courts…relating to proceedings before those courts."

Two critical facts connect *Innovair*, *Vereda*, *Allustiarte* and *Joshua*. First, as we explain in more detail in Part B of our Argument below, in each of those cases the plaintiffs could avail themselves of robust statutory review schemes which

displaced the Tucker Act. And second, in each of those cases, the courts at issue were acting in their judicial – as opposed to administrative – capacities. This is a significant fact which went unaddressed by the Claims Court. Indeed, whereas it is well settled that courts lack the jurisdiction to "scrutinize" the judicial decisions of their sister courts, courts may "scrutinize" *administrative* decisions, and the Supreme Court treats the two varieties of decisions very differently.

In *Forrester v. White*, 108 S. Ct. 538 (1988), a case confronting the question of whether judges could be sued for allegedly discriminatory decisions related to court employees, the Supreme Court discussed the distinction between administrative and judicial decisions:

> In the case before us, we think it clear that Judge White was acting in an administrative capacity when he demoted and discharged Forrester. Those acts - *like many others involved in supervising court employees and overseeing the efficient operation of a court* - may have been quite important in providing the necessary conditions of a sound adjudicative system. The decisions at issue, however, were not themselves judicial or adjudicative. As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to

absolute immunity from liability in damages under § 1983.

*Forrester*, 484 U.S. at 229; (emphasis added).

In the case below, the Claims Court acknowledged that the Service Provider Continuity and Payment Order was administrative in nature, but failed to consider the significance of the distinction between the administrative and judicial acts of Chief Judge Jones. Indeed, in its decision, the Claims Court wrote that it *per se* lacked the jurisdiction to scrutinize the determinations of Judges Jones and Hittner, regardless of the capacity and context in which those determinations were made. But no case stands for that overly broad proposition, and *Forrester* dictates that the administrative acts of judges are subject to the same level of scrutiny as the administrative acts of other administrative actors.

Here, it is undisputed that Chief Judge Jones's Continuity and Payment Order was an administrative order. Accordingly, no *per se* rule exists barring other courts from scrutinizing it. In the case below, the Claims Court created a *per se* rule where none previously existed, and treated the Order as immune from review for no other reason than that it was penned by a federal judge. This was erroneous; *see Forrester*, 484 U.S. at 229 ("...it was the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis.") In reality, Chief Judge Jones's order was administrative in nature, and therefore subject to review as a taking in the Claims Court in the same exact fashion as the

acts of all other administrative actors. We respectfully move this Court to reverse the Claims Court's decision.

## B. The Claims Court Erred in Holding that the CJA Displaced the Tucker Act.

In its order dismissing Marcum's takings claim, the Claims Court ruled that it lacked jurisdiction to hear Marcum's case because the CJA contains a "statutory remedy" which preempts the Tucker Act; A13, *citing Shearin v. United States*, 992 F.2d 1195, 1196 (Fed. Cir. 1993). The Claims Court was mistaken.

When evaluating "whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examine the purpose of the statute, the entirety of its text, and the structure of review that it establishes.'" *Horne v. USDA*, 186 L. Ed. 2d 69, 82 (2013); *quoting United States v. Fausto*, 484 U.S. 439, 444 (1988); *see also United States v. Bormes*, 133 S. Ct. 12 (2012). Here, the only "review" actually contained in the statute is found at 18 U.S.C. § 3006A(e)(3) which provides that the chief judge of the circuit must "certify" any payment in excess of the statute's $2400 maximum. As described by the Sixth Circuit, "the determination rests entirely with the discretion of the district court, ***with only minimal review by the chief judge of the circuit***." *United States v. Stone*, 53 F.3d 141, 142 (6th Cir. 1995) (emphasis added)*.*

The minimal review function delegated by the statute to the chief judge of a circuit is ***not*** an appeal, and a lawyer or expert aggrieved by a CJA order issued by

the district court cannot turn to the chief judge of the circuit for redress; *see e.g. In re Gross*, 704 F.2d 670, 673 (2d Cir. 1983) ("…the chief judge of a circuit has no power to entertain an appeal from a denial of certification of excess payment by the court in which the representation is rendered or to award compensation in an amount more than that certified by that court.") As set forth in the statute, Chief Judge Jones's review of the payment owed to Marcum did not occur at the request of Marcum. Instead, it occurred automatically because Marcum's payment exceeded the statutory maximum of $2400. In no way was this "review" designed to benefit Marcum.

Beyond the statute itself, the Claims Court held that the only recourse available to Marcum would be a motion for reconsideration filed with the chief judge and a petition for writ of mandamus filed with the Supreme Court. Neither of these pathways appears in the CJA; instead, both have been written into it by the district courts and circuit courts of appeals in cases typically involving lawyers attempting to appeal district court denials of fee applications, but none of which involved a judge ordering a non-lawyer to continue working with no promise of future payment.

Of course, the Supreme Court has never issued an opinion on a petition for writ of mandamus filed by a party aggrieved by a CJA order or ruled that a writ of mandamus is even available in such a case. Moreover, given the incredibly high

standard that a party must satisfy in order to receive such a writ, we question whether the Supreme Court would even agree that mandamus is available in cases like this. In *Kerr v. United States Dist. Court for Northern Dist.*, 426 U.S. 394, 402-404 (1976), the Court explained that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations. [The writ] has traditionally been used in the federal courts **only to confine an inferior court to a lawful exercise of its prescribed jurisdiction** or to compel it to exercise its authority when it is its duty to do so." *Id.*, *at* 402; (emphasis added) (internal quotations omitted).

Thus, as a matter of law, even if a writ of mandamus was available to a party aggrieved by a CJA order, such a writ would not substitute for the filing of a takings claim in this Court. On the one hand, the purpose of the writ of mandamus is to "confine an inferior court to a lawful exercise of its prescribed jurisdiction…" *Kerr supra.* However, it is well settled that "*ultra vires* conduct cannot give rise to a Fifth Amendment taking…" *Del Rio*, 146 F.3d 1358, 1362 (Fed. Cir. 1998). As such, the writ petition and takings claim serve totally different purposes, are based on totally different underlying theories, and the Claims Court erred when it ruled that the former was a substitute for the latter.

Ultimately, the Claims Court's interpretation of the CJA leads to the total elimination of Marcum's due process rights. This was erroneous. It is well settled that the courts should not interpret statutes in such a way as to compel odd or

extraordinary results unless that was the explicit intent of Congress; *see e.g. Kent v. Dulles*, 357 U.S. 116, 129-130 (1958) ("…we deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that Congress…had given the Secretary authority to withhold passports to citizens because of their beliefs or associations. Congress has made no such provision in explicit terms; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement."); *see also Public Citizen v. DOJ*, 491 U.S. 440, 454-455 (1989).

In sum, whereas the Claims Court ruled that the Tucker Act was preempted by the CJA, an examination of the CJA's "compensation framework" shows the Claims Court's ruling to be erroneous. In reality, at least for parties like Marcum, the CJA contains no review mechanism at all, and the two challenges that the courts have written into the CJA over time are not designed to allow reviewing courts to examine whether an order entered pursuant to the CJA was a taking. As such, the Tucker Act is not preempted by the CJA. We respectfully move this Court to reverse the decision of the Claims Court.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, we respectfully submit that this Court should reverse the decision of the Claims Court and enter an Order ruling that the Claims Court has the subject matter jurisdiction necessary to hear Marcum's takings claim.

Dated January 2, 2014                    Respectfully Submitted,

/s/ Andrew S. Ittleman
Andrew S. Ittleman, Esq.
Mitchell S. Fuerst, Esq.
Joseph A. DiRuzzo, III, Esq.
Fuerst Ittleman David & Joseph, PL
1001 Brickell Bay Drive
32nd Floor
Miami, FL 33131
Tel: 305.350.5690
Fax: 305.371.8989
Email: AIttleman@fuerstlaw.com

# **ADDENDUM**

## <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

Judgment and Opinion of
The Honorable Marian Blank Horn
     filed August 2, 2013 .............................................................................Add. 1

# In the United States Court of Federal Claims

**No. 13-189 C**

**MARCUM, LLP,**

            **v.**

**THE UNITED STATES**

**JUDGMENT**

Pursuant to the court's Opinion, filed August 2, 2013, granting defendant's motion to dismiss plaintiff's amended complaint,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the amended complaint is dismissed.

        Hazel C. Keahey
        Clerk of Court

**August 2, 2013**      By:    s/Lisa L. Reyes

        Deputy Clerk

<u>NOTE</u>: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>.  Filing fee is $455.00.

# In the United States Court of Federal Claims

**No. 13-189C**
**Filed: August 2, 2013**

```
* * * * * * * * * * * * * * *   *
```
|  |  |
|---|---|
| **MARCUM LLP,** | |
| **Plaintiff,** | |
| **v.** | **Motion to Dismiss; Lack of Subject Matter Jurisdiction; Criminal Justice Act, 18 U.S.C. § 3006A; Fifth Amendment Takings Claim.** |
| **UNITED STATES,** | |
| **Defendant.** | |

```
* * * * * * * * * * * * * * *   *
```

**Joseph A. DiRuzzo, III**, Fuerst Ittleman David & Joseph, PL, Miami, Florida, for plaintiff.  With him were **Andrew S. Ittleman** and **Mitchell Fuerst**, Fuerst Ittleman David & Joseph, PL, Miami, Florida.

**James R. Sweet**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were **Reginald T. Blades, Jr.**, Assistant Director, **Jeanne E. Davidson**, Director, Commercial Litigation Branch, and **Stuart F. Delery**, Acting Assistant Attorney General, Civil Division.

## O P I N I O N

<u>**HORN, J.**</u>

### FINDINGS OF FACT

Plaintiff, Marcum LLP, is a professional services firm with offices in New York, New Jersey, Connecticut, Pennsylvania, Florida, Massachusetts, California, Grand Cayman, and China.  Among the services plaintiff offers, plaintiff provides forensic accounting and litigation support services, including expert witness services, for both civil and criminal trials.  Plaintiff filed its original complaint in the United States Court of Federal Claims on March 13, 2013, and an amended complaint on May 30, 2013, alleging that the Chief Judge of the United States Court of Appeals for the Fifth Circuit, Edith H. Jones, caused an uncompensated taking of plaintiff's property in violation of the Fifth Amendment to the United States Constitution when she issued a Service Provider Continuity and Payment Order (Continuity and Payment Order), coupled with a notice of a contempt hearing, resulting in "an enforced requisitioning of Marcum's

business for the duration of Mr. Stanford's criminal trial."[1]  Plaintiff claims a property interest in what it describes generally as "professional services" and "'business assets' [that] include, but are not limited to, contract rights, the right to exclusive use of its property, and the right to dispose of its property."

Plaintiff's claim arises out of services it rendered to assist in the criminal defense of Mr. Stanford, who was indicted by the United States in the United States District Court for the Southern District of Texas on June 18, 2009.  In the indictment, the government alleged that Mr. Stanford had defrauded investors through a multi-billion dollar "Ponzi"-type scheme.  Plaintiff states that on June 19, 2009, the government made public its indictment of Mr. Stanford and arrested him.  According to plaintiff's amended complaint, on the same day, the Securities and Exchange Commission instituted fraud proceedings against Mr. Stanford and his company, the Stanford Financial Group, and the government "seized 33 offices of the Stanford Financial Group" along with Mr. Stanford's personal assets.

Plaintiff alleges that Judge David Hittner of the United States District Court for the Southern District of Texas, who presided over Mr. Stanford's trial court, criminal proceedings, declared Mr. Stanford indigent on October 27, 2010, after finding that the government's seizure of Mr. Stanford's assets left him without sufficient financial resources to retain defense counsel.  Pursuant to the Criminal Justice Act (CJA), Judge Hittner appointed defense counsel to Mr. Stanford.  See 18 U.S.C. § 3006A (Supp. IV 2010).  Plaintiff asserts that, in June 2011, because the government's case against Mr. Stanford was broad in scope and implicated highly technical financial transactions, Mr. Stanford's appointed defense attorneys sought assistance from plaintiff in preparation for trial, including forensic accounting and expert witness services.  Plaintiff was appointed to assist in Mr. Stanford's defense under a provision of the CJA that provides for "[s]ervices other than counsel."  See 18 U.S.C. § 3006A(e)(1).  The applicable provision states:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.  Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

---

[1] Both plaintiff and defendant refer to Mr. Stanford as "Allan R. Stanford" throughout their filings in this court.  A petition for a writ of mandamus filed by plaintiff in the United States Supreme Court, which was attached to one of defendant's filings in this court, however, indicates that plaintiff provided services in relation to the defense of Robert Allen Stanford, using a different middle name spelling.  The government's June 18, 2009 indictment also identifies the individual as Robert Allen Stanford.  See Indictment, United States v. Stanford, No. H-09-342 (S.D. Tex. June 18, 2009).

Id.

Plaintiff's compensation was governed by the following provision of the CJA, which also addresses the process for the approval of requests for compensation that exceed the statutory maximum:

> Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $2,400, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

18 U.S.C. § 3006A(e)(3).

Plaintiff maintains that, pursuant to the CJA provisions quoted above, it was required to obtain court certification as the cost of the services it rendered for Mr. Stanford's defense substantially would exceed $2,400.00. Before beginning its work, plaintiff asserts that it submitted to presiding District Court Judge Hittner a preliminary budget which estimated the projected cost of its services at approximately $4.5 million. Plaintiff alleges that Judge Hittner approved plaintiff's preliminary budget and authorized plaintiff to commence its work.[2] Plaintiff's amended complaint does not allege, however, that the Chief Judge of the Circuit or her delegee approved plaintiff's preliminary budget or the revised budget that plaintiff alleges to have subsequently submitted.

Plaintiff states that, in accordance with the Southern District of Texas' CJA plan, it submitted monthly vouchers for services rendered in June, July, and August 2011 to the District Court for the Southern District of Texas. In September 2011, plaintiff claims that it became aware that Judge Hittner had certified its June, July, and August 2011 vouchers and submitted them for approval to the United States Court of Appeals for the Fifth Circuit. Plaintiff further states that it was paid pursuant to its June, July, and August 2011 vouchers in October 2011. In addition, plaintiff alleges that, in September

---

[2] Guidelines for the administration of the CJA set forth in the Guide to Judiciary Policy provide that, "[i]f it can be anticipated that the compensation will exceed the statutory maximum, advance approval should be obtained from the court and the chief judge of the circuit (or the active or senior circuit judge to whom excess compensation approval authority has been delegated)." Guidelines for the Administration of the CJA and Related Statutes, 7A Guide to Judiciary Policy Ch. 3, § 310.20.20(b).

2011, it submitted a revised budget at the request of defense counsel and the District Court. Plaintiff's revised budget reduced its estimated costs to $3.2 million, based on its anticipated expenses of $428,250.00 per month for September, October, November, and December 2011.

Plaintiff also alleges that it submitted monthly vouchers to Judge Hittner, totaling $845,588.48, for services rendered in September, October, and November 2011. Before Judge Hittner certified either of plaintiff's September or October 2011 vouchers, plaintiff alleges that, at the request of the Court of Appeals for the Fifth Circuit, Judge Hittner appointed attorney Marlo P. Cadeddu to act as a discovery expert and to review plaintiff's budget and expenses. Plaintiff states that, in a memorandum to the Chief Judge of the Court of Appeals for the Fifth Circuit, dated December 20, 2011, which plaintiff characterizes as "highly favorable," Ms. Cadeddu recommended that Mr. Stanford's defense experts continue to receive funding, given the highly technical nature of Mr. Stanford's case. According to plaintiff's amended complaint, Judge Hittner certified plaintiff's vouchers for September and October 2011, but took no action on its November 2011 voucher.

Plaintiff alleges in its amended complaint that, as of December 30, 2011, Marcum was still working, but had not been paid for any of the work it performed in September, October, November, and December of 2011, despite a favorable review regarding plaintiff's work as essential to Mr. Stanford's defense. Plaintiff alleges it then "was owed approximately $700,000." Plaintiff states that the lack of payment for its services led it to tender a letter of resignation to Mr. Stanford's defense counsel on December 30, 2011. According to plaintiff's amended complaint, on the same day, Mr. Stanford's defense attorneys filed plaintiff's letter of resignation under seal with the District Court, as an attachment to an agreed motion to continue Mr. Stanford's fast approaching January 23, 2012 trial date.

According to plaintiff, on January 4, 2012, the Chief Judge of the United States Court of Appeals for the Fifth Circuit entered a Continuity and Payment Order, which directed plaintiff to continue work on Mr. Stanford's defense through the conclusion of the case in the District Court, as the impending trial date, at that point less than three weeks away, would have made finding a replacement "neither feasible nor economical." In addition to requiring plaintiff to continue assisting with Mr. Stanford's defense, in the same Continuity and Payment Order, Chief Judge Jones approved payment of $205,000.00 on plaintiff's September, October, and November 2011 vouchers, pending Judge Hittner's certification of plaintiff's November 2011 voucher. Plaintiff also maintains that, on January 6, 2012, it was advised that Chief Judge Jones had noticed Marcum for a contempt hearing scheduled for January 9, 2012.

In response to Chief Judge Jones' Continuity and Payment Order, plaintiff alleges it retained its own counsel, who filed numerous motions on Marcum's behalf. On January 7, 2012, plaintiff filed an <u>ex</u> <u>parte</u> emergency motion with Chief Judge Jones asking her to reconsider the Continuity and Payment Order, which plaintiff alleges was denied. Plaintiff also filed a petition for a writ of mandamus at the United

4

States Supreme Court on January 18, 2012, which was denied on February 21, 2012, and an emergency application for stay pending the disposition of the petition for a writ of mandamus by the United States Supreme Court on January 19, 2012, which was denied on January 20, 2012. Plaintiff's counsel then, on January 25, 2012, appears to have filed an ex parte emergency motion for stay with Chief Judge Jones, which was also apparently denied. In addition, likewise on January 25, 2012, plaintiff's counsel filed a notice of appeal in the United States District Court for the Southern District of Texas, which was dismissed for lack of jurisdiction by the United States Court of Appeals for the Fifth Circuit on February 8, 2012. Finally, on January 27, 2012, plaintiff's counsel filed an emergency motion for stay, or in the alternative, a petition for writ of mandamus in the United States Court of Appeals for the Fifth Circuit, which were dismissed for lack of jurisdiction on February 9, 2012. See In re Marcum L.L.P., 670 F.3d 636 (5th Cir. 2012). Plaintiff claims that, as a result, it was confronted with "the Hobson's choice of resigning and being held in contempt of court on the one hand, and continuing to work and incurring devastating financial losses on the other." Plaintiff opted to continue providing services through the end of Mr. Stanford's trial.

On May 15, 2013, defendant moved to dismiss plaintiff's original complaint for lack of subject matter jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) (2012). Defendant argued in its initial motion to dismiss plaintiff's original complaint that plaintiff had failed to allege its continued compliance with applicable procedures for seeking compensation for services it rendered after November 2011. On May 30, 2013, plaintiff amended its complaint in this court to include an allegation that it had continued to submit payment vouchers following Chief Judge Jones' entry of the Continuity and Payment Order. Plaintiff claims that it submitted three further vouchers in January and March 2012 for services it rendered between December 2011 and March 2012. Plaintiff also asserts that it submitted a voucher for final payment on June 22, 2012, which "indicated that no work was performed between March 9, 2012 and June 22, 2012." Plaintiff alleges that, "[i]n sum, Marcum was left with $1,204,422.18 in unpaid fees."

On June 17, 2013, defendant filed a revised motion to dismiss plaintiff's amended complaint alleging only lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), because entertaining plaintiff's alleged takings claim would require this court to review the actions of the United States District Court for the Southern District of Texas and the United States Court of Appeals for the Fifth Circuit. Defendant asserts that this court cannot examine Chief Judge Jones' entry of the Continuity and Payment Order, regardless of whether it is classified as a judicial or administrative action, because doing so would require the Court of Federal Claims to "second-guess the decision or action of another…court." Defendant asserts that the appropriate course of action for plaintiff was to utilize "the appellate process available to review that decision," rather than to collaterally attack the decision of the Chief Judge of the United States Court of Appeals for the Fifth Circuit by filing an alleged takings claim in the Court of Federal Claims. Defendant also argues that this court lacks jurisdiction over plaintiff's amended complaint because the CJA includes its own comprehensive scheme of administrative and judicial review over compensation decisions, which does not include the United

5

States Court of Federal Claims.

Plaintiff responds that it is not appealing Chief Judge Jones' Continuity and Payment Order, but that it is presenting a takings claim, over which this court has jurisdiction. Plaintiff states that "[w]ho the actor was or which agency of the federal government created the taking does not govern this analysis." Plaintiff contends that pursuing a writ of mandamus is "not [a] substitute for the filing of a takings claim in this Court," and that this court is the only appropriate court in which it can challenge Chief Judge Jones' Continuity and Payment Order as a taking. Finally, plaintiff argues that the CJA does not contain a comprehensive scheme for judicial review of compensation decisions because the Act's only "minimal" provision for review of the District Judge's fee determinations is by the Chief Judge of the Circuit with regard to certification of excess fees. According to plaintiff, this is "***not*** an appeal and does not allow an aggrieved party to challenge a district court's denial of excess fees." (emphasis in original). Plaintiff argues that filing a motion for reconsideration with the Chief Judge of the Circuit and a petition for a writ of mandamus with the Supreme Court, the available remedies defendant cites, and which plaintiff has already pursued, "have been written into the CJA by courts over time" and are "not designed to raise the issues brought in a takings case filed with the Claims [sic] Court."

## DISCUSSION

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction...may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject

6

matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where...neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc., v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part, 546 U.S. 975 (2005), and cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2012); Fed. R. Civ. P. 8(a)(1), (2) (2013); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' [Bell Atl. Corp. v. Twombly,] 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557).

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), as recognized in Davis v. Scherer, 468 U.S. 183, 190, reh'g denied, 468 U.S. 1226 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (Supp. V 2011).

As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); United States v. Testan, 424 U.S. 392, 400 (1976); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States...." United States v. Mitchell, 463 U.S. 206, 216 (1983); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), petition for cert. filed (U.S. 2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must...identify a substantive source of law that creates the right to recovery of money damages against the United States."). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

The underlying monetary claims are of three types.... First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver.... Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S.[ Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580[, cert. denied, 348 U.S. 834 (1954)])).... Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the

plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 7. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also Testan[ v. United States], 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself....can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009).

Plaintiff alleges that Chief Judge Jones' Continuity and Payment Order, coupled with the threat of contempt sanctions, "constituted the taking of Marcum's property because it amounted to the enforced requisitioning of Marcum's business for the duration of Mr. Stanford's criminal trial." Plaintiff asserts that it had "numerous property interests, all of which were taken by the United States for public use via the Service Provider Continuity and Payment Order, together with threats of sanctions." Plaintiff describes these interests "generally…as its 'business assets' [that] include, but are not limited to, contract rights, the right to exclusive use of its property, and the right to dispose of its property."

9

Although acknowledging that the United States Court of Federal Claims possesses jurisdiction over takings claims, defendant argues that this case does not present a genuine takings claim because the Court of Federal Claims cannot entertain a claim that "requires the court to 'scrutinize the actions of' another tribunal." (quoting Vereda, Ltda. v. United States, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (quoting Allustiarte v. United States, 256 F.3d 1349, 1352 (Fed. Cir.), cert. denied, 534 U.S. 1042 (2001))). Plaintiff responds that "[t]he Government's argument is simple enough on its face, but in reality takes [Chief] Judge Jones's [sic] order and Marcum's takings claim entirely out of context," because, as noted above, "[w]ho the actor was or which agency of the federal government created the taking does not govern this analysis."

Contrary to plaintiff's position, the United States Court of Appeals for the Federal Circuit has held "that the Court of Federal Claims lack[s] jurisdiction to entertain a takings claim that 'would have to determine whether appellants suffered a categorical taking of their property at the hands of the...courts.'" Innovair Aviation Ltd. v. United States, 632 F.3d 1336, 1343 (Fed. Cir.) (quoting Allustiarte v. United States, 256 F.3d at 1352) (omission in original), reh'g en banc denied (Fed. Cir. 2011), cert. denied, 132 S. Ct. 999 (2012); see also Joshua v. United States, 17 F.3d 378, 380 (Fed. Cir. 1994) ("[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts or the clerks of district courts relating to proceedings before those courts."). In Innovair, the court noted that "the Court of Federal Claims 'cannot entertain a taking[s] claim that requires the court to 'scrutinize the actions of' another tribunal.'" Innovair Aviation Ltd. v. United States, 632 F.3d at 1343 (quoting Vereda, Ltda. v. United States, 271 F.3d at 1375 (quoting Allustiarte v. United States, 256 F.3d at 1352)).

Plaintiff argues that its takings claim is "not an appeal of the [Continuity and Payment] Order," and that plaintiff "is not alleging that the Service Provider Continuity and Payment Order was erroneous, unauthorized or ultra vires." Although cloaked as a takings claim, to the extent that plaintiff seeks compensation for the reduction of its September, October, and November 2011 vouchers and for "$1,204,422.18 in unpaid fees" allegedly earned pursuant to its CJA assignment in Mr. Stanford's criminal trial, such review would necessarily require this court to scrutinize the propriety of District Court Judge Hittner's and Chief Judge Jones' determinations regarding plaintiff's compensation under the CJA.[3]

The CJA vests in the presiding District Court Judge in a criminal case exclusive jurisdiction to determine compensation under the CJA, and in the Chief Judge of the relevant Circuit Court of Appeals the authority to approve or deny determinations that

---

[3] In the Continuity and Payment Order, which plaintiff identifies as effecting the alleged taking, Chief Judge Jones addressed only plaintiff's September, October, and November 2011 vouchers. The Continuity and Payment Order did not address payment of plaintiff's subsequent vouchers beyond establishing a schedule for their submission and consideration.

exceed the statutory maximum.[4]  See 18 U.S.C. §§ 3006A(d)(3), (e)(3).  A presiding judge's determination of fee awards pursuant to the CJA is a non-judicial, non-appealable administrative order.  See Shearin v. United States, 992 F.2d 1195, 1196 (Fed. Cir. 1993).  CJA compensation claims are not takings nor breach of contract claims.  Rather, they are statutory claims derived under the CJA.  See Shearin v. United States, 26 Cl. Ct. 678, 679 (1992), aff'd, 992 F.2d 1195 (Fed. Cir. 1993).  According to the Shearin court, "[t]he source of any right the plaintiff has to payment" requires that payment be sought from "the court in which the representation occurs."  Id.  The Shearin court indicated that in the CJA, "[c]learly, the 'court' referred to is the court in which the representation occurs, not the Claims Court, which hears no criminal cases."  Id.  Also according to the Shearin court, the exclusive framework through which the plaintiff in that case could have sought compensation was the CJA, stating, "[i]t is well-settled that 'where a statute creates a right and provides a special remedy, that remedy is exclusive.'"  Id.  (quoting United States v. Babcock, 250 U.S. 328, 331 (1919)).

In affirming the Claims Court's ruling in Shearin,[5] the United States Court of Appeals for the Federal Circuit joined those courts of appeals that concluded that a presiding judge's "fee determination under the CJA is an administrative rather than a judicial determination and, therefore, is not an appealable order under 28 U.S.C. § 1291."  Shearin v. United States, 992 F.2d at 1196; see also In re Carlyle, 644 F.3d 694, 698-99 (8th Cir. 2011) ("As far as I am aware, every circuit court of appeals and chief judge to consider the issue has held the CJA does not confer any appellate jurisdiction to review such an appeal and thus the district court's denial or reduction is unreviewable.… I likewise conclude the CJA does not confer appellate jurisdiction....");  United States v. French, 556 F.3d 1091, 1093 (10th Cir. 2009) ("[T]he district court has complete discretion, subject only to minimal review by the chief judge of the circuit." (citing United States v. Stone, 53 F.3d 141, 143 (6th Cir. 1995)));  Landano v. Rafferty, 859 F.2d 301, 302 (3d Cir. 1988) (holding that a district judge's decision to deny retroactive appointment is not appealable);  United States v. Rodriguez, 833 F.2d 1536, 1537-38 (11th Cir. 1987) ("We agree with the Seventh and Ninth Circuits that fee determinations under the Criminal Justice Act are not appealable.  The Act itself makes no provision for appeal of such determinations.  Rather, the Act confers upon the presiding judge or magistrate the discretion to set the amount of compensation so long as it is under the statutory maximum.");  In re Gross, 704 F.2d 670, 673 (2d Cir. 1983) ("[T]he chief judge of a circuit has no power to entertain an appeal from a denial of certification of excess payment by the court in which the representation is rendered or to

---

[4] CJA appointments are integrally related to criminal proceedings, over which this court lacks jurisdiction.  See Joshua v. United States, 17 F.3d at 379 (noting the "specific civil jurisdiction" of the Court of Federal Claims); see also Mendes v. United States, 88 Fed. Cl. 759, 762, appeal dismissed, 375 F. App'x 4 (Fed. Cir. 2009).

[5] The United States Claims Court was redesignated as the United States Court of Federal Claims in the time between the Claims Court's ruling in Shearin and the Federal Circuit's consideration of the Claims Court's decision on appeal.  See Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506, 4516.

11

award compensation in an amount more than that certified by that court."); In re Baker, 693 F.2d 925, 927 (9th Cir. 1982) (holding that a District Court Judge's fee certifications are a non-reviewable administrative act); United States v. Lynch, 690 F.2d 213, 213-14 (D.C. Cir. 1982) (transferring a request for reconsideration to the court before which the services were rendered); United States v. Smith, 633 F.2d 739, 740-42 (7th Cir. 1980) ("This statutory scheme clearly requires that appropriate awards of compensation are left to the discretion of the court which has had the opportunity to view the proceedings first hand."), cert. denied, 451 U.S. 970 (1981); United States v. D'Andrea, 612 F.2d 1386, 1387 (7th Cir. 1980) (holding that a petition for rehearing is the appropriate remedy when a judge has allowed or certified compensation less than requested). In addressing the jurisdiction of the Court of Federal Claims, the Court of Appeals for the Federal Circuit agreed that the CJA affords a statutory remedy that "preempts a more general remedy," a principle the court found "especially applicable where jurisdiction is founded on the Tucker Act because of concerns about sovereign immunity." Shearin v. United States, 992 F.2d at 1196. The Court of Appeals for the Federal Circuit concluded that the Court of Federal Claims lacks jurisdiction over claims concerning CJA fee determinations, which must be decided by the presiding tribunals. Id. at 1197.

As described above, on January 4, 2012, Chief Judge Jones issued the Continuity and Payment Order, authorizing payment of $205,000.00 of the $845,588.48 plaintiff requested in its September, October, and November 2011 vouchers, pending Judge Hittner's certification of plaintiff's November 2011 voucher. Pursuant to 18 U.S.C. § 3006A(e)(3), the Continuity and Payment Order marked the final determination on plaintiff's compensation for services rendered during September, October, and November 2011. The Continuity and Payment Order did not determine payment for services rendered after November 2011, but did establish a timeline for the submission and consideration of vouchers for those services. With respect to compensation for services rendered after November 2011, plaintiff concedes that Chief Judge Jones was acting within her authority when she issued the Continuity and Payment Order and issued a notice of a contempt hearing to plaintiff. Moreover, despite plaintiff's assertion that "it was forced to work against its will with no promise of future payment," the Continuity and Payment Order did not deny plaintiff the opportunity to file requests for compensation for its future services. In fact, Chief Judge Jones made clear in the Continuity and Payment Order that, prior to plaintiff's attempted resignation, plaintiff "ha[d] been assured that further compensation would be available" and that, with respect to plaintiff's future services, "[r]equests for compensation pursuant to the Criminal Justice Act will be considered" according to a clearly specified timetable included in the Continuity and Payment Order.

Plaintiff indicates in its amended complaint that it continued to submit vouchers for services rendered after the Continuity and Payment Order was issued, but provides no information regarding the disposition of those vouchers beyond plaintiff's declaration that, "[i]n sum, Marcum was left with $1,204,422.18 in unpaid fees" after submitting its final voucher for payment. Plaintiff alleges in its amended complaint, and acknowledges in its response to defendant's motion to dismiss, that the process by which consultants appointed under the CJA are compensated for their services is "governed by the CJA."

Any compensation due to plaintiff for services plaintiff rendered after the entry of the Continuity and Payment Order must continue to be determined in accordance with the CJA, not by entertaining an alleged takings claim that seeks review of the District and Circuit Courts' compensation decisions.

As defendant argues in its motion to dismiss, relying upon United States v. D'Andrea, 612 F.2d 1386, plaintiff's only recourse for any review of the Chief Judge's decision was to file a motion for reconsideration with Chief Judge Jones or a petition for a writ of mandamus at the Supreme Court. In D'Andrea, the Court of Appeals for the Seventh Circuit held that it lacked jurisdiction because:

> [W]hen the chief judge of the circuit has approved compensation or reimbursement less than that amount certified by the court in which the representation was rendered, counsel may request reconsideration by motion. However, this motion is addressed solely to the chief judge. Upon disposition of the request for the chief judge to review his decision, further review of the chief judge's decision is not available from this Court and any counsel's further remedy lies in a mandamus action in the United States Supreme Court.

Id. at 1387-88; see also United States v. Obasi, 435 F.3d 847, 852 (8th Cir.) ("[A] determination by the chief circuit judge can only be challenged by seeking reconsideration or mandamus in the Supreme Court."), reh'g and reh'g en banc denied (8th Cir. 2006).

In the case currently before this court, plaintiff has availed itself of the remedies provided. Plaintiff indicates that it filed an ex parte emergency motion for reconsideration before Chief Judge Jones, along with a petition for a writ of mandamus in the United States Supreme Court, both of which were apparently denied. Plaintiff also filed an emergency motion for stay and, in the alternative, a petition for a writ of mandamus, challenging the requirement that plaintiff continue working on Mr. Stanford's case, in the United States Court of Appeals for the Fifth Circuit, which were dismissed. See In re Marcum L.L.P., 670 F.3d 636. The Court of Appeals for the Fifth Circuit stated that, although plaintiff "does not appeal the actual amount of funds awarded, the Order has nevertheless been issued pursuant to the Chief Judge's authority under the CJA. As such, we have no jurisdiction to consider its merits." Id. at 638. The Court of Appeals for the Fifth Circuit held that "[w]hether the Chief Judge erred in issuing such an order can be resolved, if at all, only by the Supreme Court." Id.

Because plaintiff's claim filed with this court challenges the Continuity and Payment Order, issued by the Chief Judge of the Court of Appeals for the Fifth Circuit and the determinations of plaintiff's compensation pursuant to the CJA, this court lacks jurisdiction to review plaintiff's claim. Plaintiff may not circumvent the compensation framework Congress enacted in the CJA by attempting to frame its complaint as an alleged Fifth Amendment takings claim in the Court of Federal Claims.

13

## CONCLUSION

For the reasons discussed above, defendant's motion to dismiss plaintiff's amended complaint is **GRANTED**.  Plaintiff's amended complaint is **DISMISSED**.  The Clerk's Office shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**

14

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 2nd day of January, 2014, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> James R. Sweet
> DEPARTMENT OF JUSTICE
>   COMMERCIAL LITIGATION BRANCH, CIVIL DIVISION
> Post Office Box 480
> Ben Franklin Station
> Washington, DC  20044
> (202) 353-9369
>
> *Attorney for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Andrew S. Ittleman
*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*5,662*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 2, 2014            /s/ Andrew S. Ittleman
                                       *Counsel for Appellant*